FILED

2013 FEB 27 PM 2:07

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELTON D. ANDERSON,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>　　　　　　Defendant. | CASE NO. 11cv3021-LAB(KSC)<br><br>REPORT AND RECOMMENDATION RE CROSS-MOTIONS FOR SUMMARY JUDGMENT<br><br>[Doc. Nos. 13 and 14.] |

Pursuant to Title 42, United States Code, Section 405(g) of the Social Security Act ("SSA"), plaintiff filed a Complaint on December 27, 2011 to obtain judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying him disability insurance benefits.[1]

Presently before the Court are: (1) plaintiff's Motion for Reversal and/or Remand [Doc. No. 13]; (2) defendant's Cross-Motion for Summary Judgment; (3) defendant's Response in Opposition to Plaintiff's Motion; and (4) the Administrative Record ("AR").

---

[1] Title 42, United States Code, Section 405(g), provides as follows: "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain a review of such decision by a civil action ... brought in the district court of the United States.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive."

-1-

1  After careful consideration of the moving and opposing papers, as well as the
2  Administrative Record and the applicable law, this Court RECOMMENDS that the
3  District Court DENY plaintiff's Motion for Reversal and/or Remand [Doc. No. 13] and
4  GRANT defendant's Cross-Motion for Summary Judgment [Doc. No. 14].

### A. *Background*

Plaintiff Elton D. Anderson was born on August 2, 1957. [Doc. No. 8-5, at p. 2.] He began work as a custodian or janitor in 1988. His job duties included general cleanup, which required standing, walking, bending, twisting, reaching, pushing, pulling, lifting up to 50 pounds, squatting, kneeling, climbing, overhead work, and grasping. [Doc. No. 8-7, at pp. 129-130.]

On January 17, 2008, while working as a janitor, plaintiff experienced a sudden onset of lower back pain that radiated to his right leg while carrying trash down some stairs. [Doc. No. 8-7, at p. 51, 60.] On January 16, 2009, about a year after his back problems began, plaintiff filed an application for Social Security Disability Insurance Benefits ("SSDI") under Title II of the SSA. After being denied benefits initially and on reconsideration, plaintiff requested a hearing.

On July 20, 2010, an administrative law judge ("ALJ") conducted a hearing and considered testimony by plaintiff; George W. Weilepp, M.D., a medical expert; and Alan E. Cummings, Ph.D., a vocational expert. At the hearing, plaintiff sought benefits as of January 1, 2009, the date he last worked. [Doc. No. 8-2, AR, at p. 10.] On July 30, 2010, the ALJ concluded in a written opinion that plaintiff was not disabled under the SSA. [Doc. No. 8-2, AR, at p. 18.]

Plaintiff requested review of the ALJ's decision by the Appeals Council, but the Appeals Counsel denied the request. As a result, the ALJ's decision became the final decision of the Commissioner of Social Security Administration as of October 27, 2011. [Doc. No. 8-2, at p. 2-3.] Plaintiff then filed his Complaint in this action on December 27, 2011 seeking judicial review of the Commissioner's final decision pursuant to Title 42, United States Code, Section 405(g). [Doc. No. 1.]

**B.** *Medical Evidence*

Plaintiff went to the Mission Valley Medical Clinic on January 17, 2008 and reported that he felt pain in his lower back and right leg a few minutes after carrying some trash down stairs at work. [Doc. No. 8-7, at p. 49-52.] At this time an x-ray report prepared at the request of Lawrence Pohl, M.D., showed that plaintiff had degenerative disc disease based on narrowing of the disc spaces at L-3 and L-5 "with mild osteophyte formation." [Doc. No. 8-7, at p. 5-7.] Plaintiff was also diagnosed with lumbosacral strain and right thigh neuropathy. Ibuprofen and Hydrocodone were prescribed for pain. Plaintiff was placed on modified work status from January 17, 2008 through January 24, 2008 with no bending, repetitive motions or awkward positions and no lifting over 20 pounds. [Doc. No. 8-7, at p. 49-52, 76.]

On January 24, 2008, plaintiff returned to Mission Valley Medical Clinic and reported that he was feeling better and wanted to return to regular duty. As a result, he was returned to regular work status. [Doc. No. 8-7, at p. 47-48, 75.] Progress notes from February 4, 2008 state that plaintiff was feeling better and was able to tolerate regular duty. He still had some tenderness but no pain. Medications were continued. [Doc. No. 8-7, at p. 74.] By February 15, 2008, plaintiff was released from treatment, because he was feeling well and only having occasional low back pain. [Doc. No. 8-7, at p. 73.]

On June 19, 2008, plaintiff returned to the doctor and reported that his low back pain had been increasing over the last three months. He reported having trouble getting up from a seated position and had pain at night. Dr. Pohl placed plaintiff on "temporary total disability from June 19, 2008 to June 23, 2008, requested physical therapy, and prescribed medications, including Ibuprofen and Hydrocodone. [Doc. No. 8-7, at p. 41-42, 72.] On June 23, 2008, plaintiff was placed back on modified work status with certain restrictions, including no lifting over ten pounds, and no bending, pushing, or pulling. [Doc. No. 8-7, at pp. 38-39, 70-71.] He then returned to regular work status on July 3, 2008. [Doc. No. 8-7, at pp. 28-33, 34-35, 68-69.]

///

Plaintiff next returned to the doctor on October 9, 2008 and reported that he had been doing well after his prior visit on July 24, 2008, but his pain increased again after he ran out of medication. The doctor requested an MRI and an orthopedic referral. Plaintiff was returned to modified work status. [Doc. No. 8-7, at p. 26-27, 67.] Shortly thereafter, on October 17, 2008, plaintiff had an MRI. The MRI report concluded as follows: "1. Moderate to severe L5-SI disc degeneration with facet arthropathy and epidural lipomatosis producing severe narrowing of the thecal sac. There is moderate bilateral foraminal stenosis with possible slight displacement of the exiting L5 nerve root on both sides. This is a chronic process. 2. Mild L1-2 and mild L4-5 disc degeneration without spinal stenosis or neural compression. This is a chronic process. 3. Otherwise unremarkable lumbar spine MRI." [Doc. No. 8-7, at p. 6.] Thereafter, the record indicates plaintiff's condition did not improve, and he continued to experience pain and was frustrated because he could not do his normal activities. [Doc. No. 8-7, at pp. 18-19, 22-25, 61, 65-67,

On November 12, 2008, plaintiff had an initial comprehensive orthopaedic medical evaluation by David G. Smith, M.D., an orthopaedic surgeon, because of continued and persistent pain. Plaintiff complained of persistent low back pain with radiation to both extremities and tingling down his right leg. After his examination and review of the medical data, Dr. Smith prescribed 6 days of a corticosteroid medication (Medrol Dosepak) to help alleviate inflammation in the lumbar spine area. Dr. Smith also noted that plaintiff was prescribed Vicodin and Motrin. However, he concluded plaintiff could remain on modified duty with no lifting over 20 pounds, no repetitive bending or stooping, and no climbing. [Doc. No. 8-7, at pp. 60-63.] Although his lower back pain continued and the Medrol Dosepak helped only slightly, plaintiff told Dr. Smith he wanted to return to regular work status as of November 26, 2008. [Doc. No. 8-7, at 16-17, 57.]

On December 8, 2008, plaintiff was re-evaluated by Dr. Smith because he had a "flare up" of symptoms after returning to his regular work duties. Noting plaintiff had

"moderate paraspinous muscle spasm" and "decreased range of motion of the lumbar spine" upon examination, Dr. Smith returned plaintiff to a modified duty status with certain restrictions. Supporting documents in the record indicate these restrictions were no lifting over 20 pounds; no repetitive bending or stooping; no walking or standing for more than 30 to 60 minutes; no kneeling or squatting; and no climbing on stairs or ladders. [Doc. No. 8-7, at p. 14, 55] Plaintiff was also examined by Dr. Smith on December 15, 2008. At this time, he was continued on modified duty with the same restrictions. [Doc. No. 8-7, at pp. 12, 59]

At the next examination on December 29, 2008, Dr. Smith placed plaintiff on "total temporary disability" because of a "significant flare up of pain" in the lower back. Dr. Smith said he planned to re-evaluate plaintiff again in about two weeks. However, this appears to be the last evaluation in the record by Dr. Smith. [Doc. No. 8-7, at pp. 53-54.]

On February 4, 2009, a Residual Functional Capacity Assessment was prepared by Dr. Mauro, a State Agency consultant, based on the information available to date. Dr. Mauro concluded the objective findings in the record were consistent with a "light" residual functional capacity assessment. [Doc. No. 8-7, at pp. 86-92.] According to Dr. Mauro, plaintiff could lift 20 pounds occasionally and 10 pounds frequently; sit and stand about 6 hours in an 8-hour workday; push and pull for operation of hand and foot controls with no limitation; occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Mauro also concluded plaintiff had no manipulation, visual, hearing, or speaking limitations. [Doc. No. 8-7, at pp. 87-90.]

On February 4, 2009, plaintiff went to Jeffrey P. Bernicker, M.D., an orthopaedic surgeon, for an initial examination and orthopedic consultation. [Doc. No. 8-7, at pp. 129-136.] Dr. Bernicker discussed treatment options with plaintiff, including a series of epidural steroid injections and surgery. However, plaintiff indicated he wanted to defer any type of invasive treatment. [Doc. No. 8-7, at p. 134.] Dr. Bernicker noted that plaintiff did not appear to be in acute distress, was able to move freely throughout the

examination room, and could walk without limping. Changing positions between sitting, standing, and supine caused a "mild degree of difficulty." Dr. Bernicker also noted tenderness in the lower lumbar spine and pain at several points during a range of motion assessment. In his assessment report, Dr. Bernicker stated it was his impression that plaintiff suffered from "1) acute industrial lumbosacral sprain/strain, 1/17/08[;] 2) presumptive longstanding underlying cumulative trauma overuse disorder resulting in chronic recurrent lumbosacral straining injury, 1988-1/17/08[; and] 3) industrial aggravation of L5-S1 degenerative disc disease, primarily at L5-S1." [Doc. No. 8-7, at p. 133.]

On March 9, 2009, plaintiff returned for a follow-up examination by Dr. Bernicker. At this time, plaintiff said he was not working. He reported low back pain radiating "through the right lower extremity to the level of the knee" and described his pain as 9 out of 10 on a constant basis. In addition, plaintiff said he had difficulty sleeping, lifting, standing, sitting, reclining, walking and climbing stairs.

Upon examination, Dr. Bernicker stated plaintiff was "pleasant and cooperative" and was "in no acute distress in the examination room." He was able to "move freely through the examination room without guarding." Plaintiff walked without a limp and was able to change positions with only a "mild degree of difficulty." Dr. Bernicker noted "tenderness to palpation over the midline of the lower lumbar spine extending into the right paralumbar region with appreciable spasm." Plaintiff also indicated he felt pain while Dr. Bernicker was assessing his range of back motion. [Doc. No. 8-7, at p. 122-128.]

In Dr. Bernicker's opinion, plaintiff "could more than likely be considered an appropriate candidate for fusion with instrumentation at L5-S1." However, plaintiff indicated he wished to "avoid surgery, if at all possible." Dr. Bernicker therefore recommended surgery "in the event of symptom progression" and if plaintiff changed his mind. Noting plaintiff wished "to defer surgical treatment," Dr. Bernicker concluded plaintiff was "permanent and stationary" and had "attained a state of maximum medical

improvement." Dr. Bernicker also concluded plaintiff's condition precluded heavy lifting and repeated bending and stooping. He did not recommend any other work limitations but stated he would need to review a job analysis to determine whether plaintiff could return to his "usual and customary occupation." [Doc. No. 8-7, at pp. 122-128.] Later, on October 21, 2009, Dr. Bernicker prepared a supplemental report indicating he had reviewed additional medical records. However, his review of these records did not change the opinions he previously reported on March 9, 2009. [Doc. No. 8-7, at p. 118-121.]

On April 1, 2010, Dr. Bernicker examined plaintiff again for a routine follow up and prepared a letter entitled "Primary Treating Physician's Supplemental Narrative/Request For Authorization." Dr. Bernicker reported that plaintiff had not returned to work and was complaining of pain ranging between 9 and 10 out of a maximum of 10. He was "using a cane for ambulation assistance" and claimed his symptoms had increased over recent months. His pain medications at this time were Motrin and Norco 7.5. Dr. Bernicker recommended an updated MRI to determine whether there is any objective basis for the increase in symptoms and referral to a pain management physician. In addition, Dr. Bernicker said, "[Plaintiff's] medication needs have reached the limit of my comfort zone. If, indeed, the patient is going to continue to defer surgical treatment for his lumbar condition, he will require long-term chronic pain management." [Doc. No. 8-7, at pp. 115-117.]

Plaintiff had a new MRI on April 12, 2010. The results state as follows: "1. Overall, little interval change is seen. 2. Degenerative discopathy L1-2. 3. Posterior central 3mm L3-L4 disc protrusion without thecal sac compression or root impingement. 4. Facet arthropathy and degenerative discopathy at L5-S1 with central canal epidural lipomatosis noted. Posterior central 4mm protrusion does not cause thecal sac compression or root management." [Doc. No. 8-7, at pp. 111-112.]

On May 11, 2010, plaintiff had an initial pain management evaluation with Sam Maywood, M.D. Dr. Maywood spent 45 minutes with plaintiff. Upon examination,

Dr. Maywood noted that plaintiff's gait was normal, and he appeared to be in "moderate to severe distress." He reported "moderate pain on palpation of the lumbar spine in the midline." A lower extremity exam revealed "negative straight leg raising on the right and positive on the left at 45 [degrees]; 5/5 strength to plantar and dorsiflexion on the right and 4/5 on the left; sensation is decreased to pinprick in the L5 distribution of the left leg; significant tenderness of the left buttock; reflexes are intact on the right and decreased on the left; pulses intact in both lower extremities."

In his report, Dr. Maywood also noted that epidural steroid injections and surgery had been recommended and these treatment options were discussed with plaintiff. Despite "very frank discussion," plaintiff declined both treatments. In Dr. Maywood's opinion, plaintiff "may benefit from epidural steroid injections." As a result, Dr. Maywood said he would continue to recommend these injections until plaintiff feels comfortable proceeding with this course of treatment. Until then, Dr. Maywood said he would continue prescribing narcotic medications. Dr. Maywood concluded as follows: "[I]t appears that the patient is suffering from elements of persistent lumbar radiculopathy. I have had the chance to review the patient's MRI. This shows multilevel disc degeneration, but clearly his problems are emanating from L5-S1. He has severe flattening of the disc and displacement of both L5 nerve roots. The left is more significant including a positive straight leg raise, diminished sensation to pinprick in the L5 distribution as well as weakness in plantar and dorsiflexion." [Doc. No. 8-7, at pp. 100-106.]

On June 30, 2010, plaintiff returned to Dr. Maywood for a pain management re-evaluation, and reported no significant changes in his pain condition since the prior appointment on May 11, 2010. Plaintiff walked with a "slow gait using a single point cane" but did not appear to be in any "acute distress." Dr. Maywood again discussed the potential benefits of epidural steroid injections but reported that plaintiff was still uncomfortable proceeding with this course of treatment. To provide some relief from burning, tingling, and numbness, Dr. Maywood prescribed Neurontin and continued the

prescriptions for plaintiff's other medications. [Doc. No. 8-7, at pp. 107-109.] This is the last medical evaluation in the record.

On July 17, 2010, Dr. Bernicker completed a Physical Capacities Evaluation indicating plaintiff could sit, stand, and walk for eight hours in an eight-hour workday, and could lift up to 50 pounds. The evaluation also indicates plaintiff could use his hands for repetitive actions; bend and squat occasionally; crawl frequently; and climb and reach continuously. However, the evaluation states that plaintiff needs the assistance of a cane to ambulate. [Doc. No. 8-7, at p. 110.]

C. *Hearing Before the ALJ Held July 20, 2010*.

Plaintiff testified that he was born on August 2, 1957. He had more than six but less than twelve years of formal education. In the past, he worked as a janitor. As of December of 2008, he was working "part-time light duty." On light duty, he did some dusting and other duties as assigned for a half day. Through his attorney, plaintiff amended the onset of his date of disability to January 1, 2009 and has not worked since that date. [Doc. No. 8-2, AR, at p. 37, 42.]

Plaintiff appeared at the hearing on July 20, 2010 with a cane. The ALJ asked, "Was that prescribed by a doctor?" Plaintiff replied, "Yes, sir. . . . [M]y leg was going out on me, and the doctor prescribed a cane because I told him I needed it. He thought I should use it." For pain management, plaintiff stated he was being treated by Dr. Maywood, an anesthesiologist. Dr. Bernicker, his primary doctor, is an orthopedic surgeon. [Doc. No. 8-2, at p. 38.] For pain, plaintiff testified he had taken Medrol, Motrin, and Vicodin. [Doc. No. 8-2, at pp. 40, 43-45.] The pain medication provides him with some relief, but plaintiff testified he is "always in pain." [Doc. No. 8-2, at p. 46.]

Dr. Weilepp, the medical expert who testified at the hearing, said he had not seen a "current" orthopedic evaluation after January 1, 2009, the alleged date of onset for plaintiff's disability. Plaintiff's counsel indicated some later documents, including an MRI from April of 2010 had been submitted. Counsel read the results of this newer MRI completed in April of 2010 into the record. The results were similar to the MRI done

previously in October of 2008. Based on the evidence before him, Dr. Weilepp concluded plaintiff did not meet or equal a listing and remained capable of performing light work with some restrictions. Although Dr. Weilepp agreed there was evidence of degenerative disc disease with pain, he said there was nothing to indicate there was "major decompensation." [Doc. No. 8-2, at pp. 40-48.]

Plaintiff's counsel asked Dr. Weilepp whether he agreed that plaintiff needed a cane to ambulate. Dr. Weilepp's opinion was that use of a cane would not be recommended under the circumstances demonstrated in the record. While Dr. Weilepp would not tell a patient in this condition that he could not use a cane, he would explain to the patient that it is not recommended because it would "throw the mechanics of the back off" and "contribute[] to more symptoms." According to Dr. Weilepp, orthopedists generally agree a cane should not be used frequently under these circumstances but only occasionally for pain. [Doc. No. 8-2, at pp. 49-50.]

Alan Cummings, a vocational expert, testified that plaintiff's past relevant work over the last 15 years was an unskilled janitor with a medium level of exertion. [Doc. No. 8-2, at pp. 50-51.] Based on plaintiff's limitation to light work, the vocational expert testified plaintiff could no longer perform his past relevant work as a janitor because it required a medium level of exertion. However, the vocational expert testified there were significant jobs available in the area and nationally for someone of plaintiff's age and skill level who could perform light work. For example, plaintiff would be able to perform the work of a packager which mostly involves work at a bench. The vocational expert further testified that the position of packager could be performed by a person who used an assistive device, such as a cane. [Doc. No. 8-2, at pp. 51-52.]

At the end of the hearing, plaintiff's counsel indicated more records had been submitted indicating plaintiff's level of work would only be "sedentary," which would affect the vocational profile. The ALJ indicated he would consider these records in reaching a final decision. [Doc. No. 8-2, at pp. 53-54.]

///

### D. *Standards of Review*

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Summary judgment motions, as defined by Fed.R.Civ.P. 56, contemplate the use of evidentiary material in the form of affidavits, depositions, answers to interrogatories, and admissions. In Social Security appeals, however, the Court may 'look no further than the pleadings and the transcript of the record before the agency,' and may not admit additional evidence. *Morton v. Califano*, 481 F.Supp. 908, 914 n. 2 (E.D.Tenn.1978); 42 U.S.C. § 405(g). Therefore, although summary judgment motions are customarily used, and even requested by the Court or Magistrate, such motions merely serve as vehicles for briefing the parties' positions, and are not a prerequisite to the Court's reaching a decision on the merits." *Kenney v. Heckler*, 577 F.Supp. 214, 216 (D.C. Ohio 1983).

To qualify for disability benefits under the SSA, an applicant must show that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least 12 months. 42 U.S.C. § 423(d). The Social Security regulations establish a five-step sequential evaluation for determining whether an applicant is disabled under this standard. 20 CFR § 404.1520(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193-1194 (9th Cir. 2004).

First, the ALJ must determine whether the applicant is engaged in substantial gainful activity. 20 CFR § 404.1520(a)(4)(I). If not, then the ALJ must determine whether the applicant is suffering from a "severe" impairment within the meaning of the regulations. 20 CFR § 404.1520(a)(4)(ii). If the impairment is severe, the ALJ must then determine whether it meets or equals one of the "Listing of Impairments" in the Social Security regulations. 20 CFR § 404.1520(a)(4)(iii). If the applicant's impairment meets or equals a Listing, he or she must be found disabled. *Id.* If the impairment does

not meet or equal a Listing, the ALJ must then determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 CFR § 404.1520(a)(4)(iv). If the applicant cannot perform past relevant work, the ALJ–at step five–must consider whether the applicant can perform any other work that exists in the national economy. 20 CFR § 404.1520(a)(4)(v).

While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003). Applicants not disqualified at step five are eligible for disability benefits. *Id.*

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). When the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld. *Batson*, 259 F.3d at 1193. The Court must weigh both the evidence that supports and detracts from the administrative ruling, and if there is evidence in the record to support the ALJ's conclusion, and the ALJ applied the correct legal standards, the District Court must affirm the ALJ's decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

### E. *ALJ's Decision of July 30, 2010*

At Step 1 of the analysis, the ALJ concluded plaintiff had not engaged in substantial gainful activity since Since January 1, 2009. At Step 2, the ALJ determined that plaintiff has the severe impairments of "multilevel degenerative disc disease, chronic pain, obesity, and a mood disorder secondary to pain (20 CFR 404.152(c))." At Step 3, the ALJ decided that plaintiff does not have an impairment or combination of impairments that meet or equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). The ALJ also concluded, based on the medical and vocational evidence, that plaintiff has the residual functional capacity to perform light work (20 CFR 404.1567(b)), because he can lift and carry 20 pounds occasionally and 10 pounds frequently with some physical limitations,

carry 20 pounds occasionally and 10 pounds frequently with some physical limitations, and has the mental capacity for unskilled work.

The ALJ's decision cites a number of medical records in support of his conclusion that plaintiff is capable of light work. First, the ALJ cited a Physical Capacities Evaluation dated July 17, 2010 by Dr. Bernicker, who had been plaintiff's treating orthopaedic physician since February 4, 2009. [Doc. No. 8-1, at p. 14; Doc. No. 8-7, at pp. 129-136; Doc. No. 8-7, at p. 110.] Dr. Bernicker's evaluation of July 17, 2010, which was prepared shortly before the hearing, is consistent with the ALJ's finding that plaintiff is at least capable of light work. The evaluation states that plaintiff could sit, stand, and walk for eight hours in an eight-hour workday and could lift up to 50 pounds. The evaluation also indicates plaintiff could use his hands for repetitive actions; bend and squat occasionally; crawl frequently; and climb and reach continuously. However, the evaluation states that plaintiff needs the assistance of a cane to ambulate. [Doc. No. 8-7, at p. 110.]

Second, the ALJ noted that an updated MRI from April 12, 2010 showed no significant objective change in plaintiff's condition. [Doc. No. 8-1, at p. 15.] Third, Dr. Weilepp, the testifying medical expert who reviewed all medical records made available to him and plaintiff's testimony from the hearing, stated plaintiff is capable of light work. Dr. Weilepp also testified there was no "current orthopaedic evaluation" that would alter his opinion. In addition, the ALJ noted that Dr. Weilepp testified based on the evidence in the record that it was unlikely plaintiff really needed a cane to ambulate. In Dr. Weilepp's opinion, most physicians would not recommend a cane under the circumstances, because it would "throw the back off." Fourth, the ALJ credited the opinion a State Agency medical consultant, Dr. Mauro, who reviewed available medical records through February 4, 2009, and concluded plaintiff could perform a light level of work. [Doc. No. 8-2, at p. 15; Doc. No. 8-7, at pp. 86-92.]

Although the ALJ found that plaintiff's medically determined impairments could reasonably be expected to cause the alleged symptoms, he concluded that plaintiff's

statements about the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the evidence indicating plaintiff could perform light work. The ALJ's credibility finding is supported by clear and convincing reasons based on the medical evidence discussed above, and plaintiff does not specifically contest this finding.[2] [Doc. No. 8-2, at p. 16; Doc. No. 13, at pp. 14-17.]

At Step 5, the ALJ found that plaintiff is unable to perform his past relevant work as a janitor. In the last step of the analysis, the ALJ decided plaintiff did not qualify for disability benefits, because he can perform significant numbers of jobs that exist in the national economy given his age, education, work experience, and residual functional capacity. (20 CFR 404.1569 and 404.1569(a)). [Doc. No. 8-2, AR, at pp. 12-17.]

F. **_Sufficiency of the Evidence_**

Plaintiff does not believe there is substantial evidence in the record to support the ALJ's conclusion that he has the residual functional capacity to perform light work. Plaintiff contends the ALJ did not fulfill his duty to fully develop the record and simply ignored evidence that supports a disability finding. For example, plaintiff complains that the ALJ failed to note or consider key parts of evaluations and restrictions imposed by his original treating orthopedist, Dr. Smith. Plaintiff believes this evidence supports a finding that he is disabled under the SSA.

The record shows that in December of 2008, Dr. Smith examined plaintiff because he had a "flare up" of symptoms after returning to his regular work duties. During this time period, Dr. Smith first put plaintiff on a modified work status with a number of restrictions: no lifting over 20 pounds, no walking or standing for more than 30 to 60 minutes, no kneeling or squatting, and no climbing of stairs or ladders. [Doc. No. 8-7, at p. 12, 14, 55, 59.] Then, on December 29, 2008, Dr. Smith re-evaluated plaintiff and placed him on "off work" or "total temporary disability" status. [Doc. No. 8-7, at p. 53.]

///

---

[2] An ALJ must support his credibility findings "with specific, clear and convincing reasons." _Taylor v. Comm'r of Soc. Sec. Admin._, 659 F.3d 1228, 1234 (9th Cir. 2011).

In plaintiff's view, it is very significant that Dr. Smith precluded all work when his symptoms increased. By contrast, the ALJ's decision only states that plaintiff was put on modified duty as of December 8, 2008 with no lifting over 20 pounds and no repetitive bending or stooping. In other words, the ALJ's decision does not acknowledge the other restrictions or the "total temporary disability" status determination made by Dr. Smith on December 29, 2008. [Doc. No. 8-2, at p. 14.]

As plaintiff contends, it is true that an ALJ has "'a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Widmark v. Barnhart*, 454 F.3d 1063, 1068 (9th Cir. 2006). In addition, administrative decisions "must make fairly detailed findings . . . to permit courts to review those decisions intelligently." However, an ALJ "need not discuss all evidence presented. . . ." *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984).

Here, the ALJ's decision is not fatally flawed simply because it does not include all of the details from Dr. Smith's evaluations of plaintiff in December of 2008. During this time period, plaintiff was evaluated by Dr. Smith because of a "flare up" of symptoms. These medical records only describe what happened over a brief period of time as a result of a "flare up" of symptoms after plaintiff returned to his regular work status. Dr. Smith clearly indicated the disability rating was "temporary" and would be evaluated again in two weeks. However, there are no further evaluations by Dr. Smith that could be located in the record. Dr. Smith's evaluations in December of 2008 are not inconsistent with the ALJ's conclusion that plaintiff retains the residual functional capacity for light work. In addition, the record is replete with evidence by later treating physicians about plaintiff's condition, so Dr. Smith's treatment notes from December of 2008 are of limited significance to the ALJ's disability and vocational evaluations as they would not be enough to support a disability finding given the record as a whole.

Next, plaintiff contends the ALJ's decision that he can do light work is not supported by substantial evidence because the record shows he needs a cane to ambulate, and light work requires the ability to ambulate without assistance for at least six out of

an eight-hour work day. According to plaintiff, the ALJ only referenced portions of the record indicating he did not need a cane and did not give full credit to plaintiff's statement that he needs a cane to ambulate. Plaintiff also believes the ALJ misconstrued or placed too much weight on the medical expert's testimony that plaintiff did not need a cane, because the medical expert only reviewed treating records through October 17, 2008 and plaintiff claims his disability began on January 1, 2009. In addition, plaintiff argues it is significant that Dr. Bernicker, a treating physician, reported on July 17, 2010 that plaintiff needs the assistance of a cane to ambulate. [Doc. No. 8-7, at p. 110.]

Plaintiff's arguments about his need to use a cane are unconvincing. First, it is true that the medical expert, Dr. Weilepp, testified he did not have "an objective evaluation from an orthopedist after January 2009," and plaintiff alleges his disability began on this date plaintiff. [Doc. No. 8-2, at pp. 40-41.] In other words, it appears that the medical expert did not have the benefit of the treatment records from Dr. Bernicker and Dr. Maywood in 2009 and 2010. However, the medical expert did have the results of the MRI from April 2010 indicating there had not been a significant change from the prior MRI in 2008. [Doc. No. 8-2, at pp. 41-42.] He was also able to question plaintiff during the hearing before the ALJ. [Doc. No. 8-2, at pp. 43-46.] In addition, because the treatment records from Dr. Bernicker and Dr. Maywood largely support the ALJ's light work determination, it is very clear that the medical expert's testimony and opinions would not have been any different if he had been able to review these later treatment records prior to the hearing.

Second, Dr. Bernicker's report of July 17, 2010 is consistent with the ALJ's finding that plaintiff is capable of light work even though it mentions that plaintiff needs the assistance of a cane to ambulate. The report states that plaintiff can sit, stand, and walk for eight hours during an eight-hour workday; lift and carry up to 50 pounds on an unlimited basis; use his hands for repetitive actions, such as grasping, pushing, pulling, and fine manipulation; use his feet for repetitive movements, such as pulling and pushing foot controls; bend and squat occasionally; crawl frequently; and climb and reach

continuously. [Doc. No. 8-7, at p. 110.] Although plaintiff told the ALJ during the hearing that the cane was prescribed by his doctor, Dr. Bernicker's treatment notes do not state he recommended that plaintiff use a cane to ambulate. He only noted that plaintiff appeared for his routine follow-up examination on April 1, 2010 "using a cane for ambulation assistance." At this time, Dr. Bernicker ordered an updated MRI to determine whether there was any objective basis for an increase in symptoms. [Doc. No. 8-7, at pp. 115-117.] As note above, the MRI results of April 12, 2010 indicate there was no significant change from the prior MRI in 2008. [Doc. No. 8-7, at pp. 111-112.]

Third, plaintiff visited Dr. Maywood for pain management in May and June of 2010, shortly before the hearing before the ALJ on July 20, 2010. Dr. Maywood's treatment notes do not indicate he recommended the use of a cane for ambulation. Rather, Dr. Maywood told plaintiff he "may benefit from epidural steroid injections" and/or surgery. [Doc. No. 8-7, at pp. 100-109.]

Fourth, the ALJ appropriately relied on the medical expert's testimony in concluding that plaintiff did not need to use a cane. Plaintiff only claimed during the hearing that his doctors prescribed a cane because he told them he needed it. [Doc. No. 8-2, at p. 38.] As noted above, the treatment notes do not indicate plaintiff's treating physicians actually prescribed or recommended a cane. As the ALJ mentions in his decision, the medical expert explained during the hearing that most orthopedists would not recommend more than occasional use of a cane for pain, because it "throw[s] the mechanics of the back off" and "contributes to more symptoms." He also testified it would be rare for a doctor to have a different opinion on this issue. [Doc. No. 8-2, at p. 16, 49-50.]

Fifth, and most importantly, the ALJ did consider the possibility that plaintiff needed a cane to ambulate. He first asked the vocational expert if a claimant could find appropriate work if he had plaintiff's limitations, as supported by the medical records, and his vocational profile. The vocational expert responded affirmatively and said, for example, that jobs as packager or light cleaner would be appropriate and these jobs were

available in significant numbers locally and nationally. The ALJ then asked the vocational expert if these jobs would still be appropriate if the claimant "had an assistive device such as a cane." The medical expert responded, "I believe packager would remain appropriate. It's benchwork in nature." [Doc. No. 8-2, at p. 52.] Therefore, substantial evidence supports the ALJ's decision that plaintiff is not disabled and is capable of light work even if plaintiff uses a cane.

Based on the foregoing, this Court can only conclude that substantial evidence supports the ALJ's decision that plaintiff remains capable of light work and is therefore not disabled under the SSA. The record shows that the ALJ conducted a full and fair hearing, analyzed the extent of the disability supported by the medical records and expert testimony, and properly supported his findings with ample evidence from the record. In addition, our thorough and exhaustive review of the entire record did not reveal any evidence that would cause this Court to question the ALJ's decision.

## **_Conclusion_**

After reviewing the Administrative Record and the briefing submitted by the parties, this Court RECOMMENDS that the Commissioner's Cross-Motion for Summary Judgment [Doc. No. 14] be GRANTED and that plaintiff's Motion for Reversal and/or Remand [Doc. No. 13] be DENIED, because the ALJ's Decision of July 30, 2010 is supported by substantial evidence.

This Report and Recommendation is submitted by the undersigned Magistrate Judge to the District Judge assigned to this case, pursuant to Title 28, United States Code, Section 636(b)(1). Any party may file objections with the District Court and serve a copy on all parties "[w]ithin fourteen days after being served with a copy" of this

///
///
///
///
///

Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may affect the scope of review on appeal. *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991).

**IT IS SO ORDERED.**

Date: _Feb. 27_, 2013

KAREN S. CRAWFORD
United States Magistrate Judge

- 19 -

11cv3021-LAB(KSC)